1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   SERGIO SEGURA,                          Case No.  CV 17-07303-RAO

12                   Plaintiff,

13        v.                                 **MEMORANDUM OPINION AND**
                                             **ORDER**
14   NANCY A. BERRYHILL, Deputy
     Commissioner of Operations of Social
15   Security,

16                   Defendant.

17

18

19   **I.    INTRODUCTION**

20        Plaintiff Sergio Segura ("Plaintiff") challenges the Commissioner's denial of

21   his application for a period of disability and disability insurance benefits ("DIB").

22   For the reasons stated below, the decision of the Commissioner is AFFIRMED.

23   **II.   PROCEEDINGS BELOW**

24        On February 22, 2012, Plaintiff applied for DIB alleging disability beginning

25   July 7, 2011.   (Administrative Record ("AR") 96-97, 105.)   His application was

26   denied initially on September 14, 2012, and upon reconsideration on June 3, 2013.

27   (AR 142, 150.)   Plaintiff filed a written request for a hearing, and a hearing was

28   held on May 27, 2014.  (AR 72, 156.)  Represented by counsel, Plaintiff appeared

and testified, along with an impartial vocational expert.  (AR 74-95.)  On June 4, 2014, the Administrative Law Judge ("ALJ") found that Plaintiff had not been under a disability, pursuant to the Social Security Act,[1] from July 7, 2011 through December 31, 2013, the date last insured.  (AR 132.)  Plaintiff sought review of the ALJ's decision by the Appeals Council.  (AR 139.)   The Appeals Council remanded Plaintiff's case on August 18, 2015, upon finding that Plaintiff's actual date last insured was December 31, 2017.  (AR 137-40.)

A second hearing was held on August 29, 2016.  (AR 39.)  Represented by counsel, Plaintiff again appeared and testified, along with an impartial vocational expert.  (AR 41-71.)  On October 28, 2016, the ALJ found that Plaintiff had not been under a disability, pursuant to the Social Security Act, from July 7, 2011 through the date of decision.   (AR 32.)   The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review.  (AR 1.)  Plaintiff filed this action on October 4, 2017.  (Dkt. No. 1.)

The ALJ followed a five-step sequential evaluation process to assess whether Plaintiff was disabled under the Social Security Act.  *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995).  At **step one**, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 7, 2011, the alleged onset date ("AOD").  (AR 21.)  At **step two**, the ALJ found that Plaintiff's Ramsay Hunt Syndrome is a severe impairment.  (AR 22.)  At **step three**, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (AR 23.)

///

///

---

[1] Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment expected to result in death, or which has lasted or is expected to last for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A).

Before proceeding to step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to:

> [P]erform medium work . . . including lifting up to 50 pounds occasionally and 25 pounds frequently, and sitting, standing and/or walking up to 6 hours in an 8-hour workday, with the following additional restrictions: no work at unprotected heights or around dangerous machinery.

(AR 23.)

At **step four**, the ALJ found that Plaintiff was able to perform past relevant work as a mail carrier and a registered nurse, and thus the ALJ did not proceed to step five. (AR 31.) Accordingly, the ALJ determined that Plaintiff has not been under a disability from the AOD through the date of decision. (AR 32.)

## III.  **STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. A court must affirm an ALJ's findings of fact if they are supported by substantial evidence and if the proper legal standards were applied. *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). An ALJ can satisfy the substantial evidence requirement "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citation omitted).

"[T]he Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence. Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001) (citations and internal quotation marks omitted). "'Where evidence is

susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)); *see Robbins*, 466 F.3d at 882 ("If the evidence can support either affirming or reversing the ALJ's conclusion, we may not substitute our judgment for that of the ALJ."). The Court may review only "the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

## IV.   DISCUSSION

Plaintiff raises the following issues for review: (1) whether the ALJ omitted multiple severe impairments at step two; (2) whether the RFC includes all limitations arising from Plaintiff's Ramsay Hunt Syndrome; and (3) whether the ALJ properly rejected Plaintiff's testimony. (*See* Joint Submission ("JS") 3.) For the reasons below, the Court affirms.

### A.      The ALJ's Credibility Determination Is Supported By Substantial Evidence[2]

Plaintiff argues that the ALJ failed to provide legally sufficient reasons for rejecting his subjective testimony. (*See* JS 17-19.) The Commissioner contends that the ALJ provided legally valid reasons for rejecting Plaintiff's testimony. (*See* JS 19-24.)

#### 1.      Plaintiff's Subjective Allegations

##### a.      *Plaintiff's May 27, 2014 Testimony*

At the first administrative hearing, Plaintiff testified that he was 51 years old and had completed high school plus two years of schooling to receive a nursing

---

[2] The Court addresses this issue first because Plaintiff relies heavily on his subjective symptoms with respect to the severity of his impairments. Subjective symptom testimony is also one factor that the ALJ must consider when assessing a claimant's RFC.

degree. (AR 80-81.) Plaintiff last worked in late June 2011 as a staff nurse at a hospital. (AR 74-75, 77.) Plaintiff explained that he stopped working because "it was hard to manage [his] condition, the . . . equilibrium." (AR 75.) He further explained that there was "an incident" with a patient, which was "a warning flag" to him. (AR 89.) Plaintiff informed his workplace that he was going to doctors' appointments, and he was told to "take the time needed to get better" until his doctor cleared him to return from medical leave. (*See* AR 75.) Plaintiff stated that after eight or nine months of leave, he informed his workplace that he was not going back, and he began collecting state disability insurance. (AR 76-77.)

Plaintiff testified that his Ramsay Hunt Syndrome prevents him from working. (AR 81.) Plaintiff explained that his condition was more manageable around 1999, while he was still working. (*See* AR 81-82.) Plaintiff's dizziness and vertigo have since become "more unmanageable." (AR 82.) Plaintiff stopped driving because it took him a couple of hours to "get over the turning of the head" when making a U-turn. (*Id.*) Plaintiff stated that he prefers to walk everywhere now, or he takes the bus. (*Id.*)

At the time of the hearing, Plaintiff was taking one class at Los Angeles City College. (AR 82-83.) A close friend had recommended that he do so to get social interaction and to stay alert mentally. (AR 83.) Plaintiff testified that he had been taking more classes, but he dropped three. (*Id.*) Plaintiff wanted to continue more classes, but he did not think that he could handle the full-time schedule. (*See* AR 83-84.)

Plaintiff lived in an apartment with a roommate. (AR 85.) He described his average day as waking up, working out, listening to the news on television or radio, stretching, taking the subway, and going to school on Tuesdays and Thursdays. (AR 84.) Plaintiff also attended weekly meetings with the Dead Philosophers Society at school. (*Id.*) Plaintiff stated that he "find[s] it interesting, and it keeps [him] social." (*Id.*) After the meetings, he goes home, eats lunch, watches

television, cleans up after his cat, and does laundry. (*Id.*) Plaintiff walks about two or three blocks to the grocery store or to the subway, but he prefers to stay home "for safety" because he gets disoriented when he walks. (AR 84-85.) Plaintiff then testified that he also likes to go sightseeing, taking his time to look at everything. (AR 85.) Plaintiff tries not to rush anywhere, which helps him control his anxiety level. (AR 84.)

Plaintiff testified that the main symptom that causes him difficulty is his disequilibrium, which causes vertigo. (AR 86.) He explained that when he walks, "[his] head feels like it's a bobble head." (*Id.*) Plaintiff also has double vision. (*Id.*) Plaintiff has had bifocal glasses for almost a year, but he does not wear them all the time because the depth perception could make him trip. (*See* AR 87.) Plaintiff later referred to the glasses as "prism glasses," and he testified that they help with the double vision, although his vertigo remains the same. (AR 92.) Plaintiff has fallen "a couple times" when getting out of the shower or when trying to get ready. (AR 87.) Plaintiff explained that when he gets anxious, it triggers his vertigo. (*Id.*) Plaintiff stated that he has vertigo about seventy percent to ninety percent of the day. (AR 88-89.) When he has an episode, he tries to calm down, take deep breaths, and be aware of his mood. (AR 88.) Plaintiff needs complete silence for half an hour to an hour to refocus. (*Id.*)

Plaintiff began taking supplements in 2013. (AR 90.) He stated that he was currently taking clonazepam. (*Id.*)

b.    *Plaintiff's August 29, 2016 Testimony*

At the second administrative hearing, the ALJ observed that Plaintiff was using a cane, although he did not have one at the prior hearing. (AR 45.) Plaintiff stated that it as prescribed to him earlier that year by a nurse practitioner at the VA. (*Id.*) The ALJ then summarized Plaintiff's testimony from the first hearing, and Plaintiff agreed that the summary was accurate. (AR 42-52.)

///

Plaintiff testified that his anxiety is the main reason that he cannot work. (AR 53.) Plaintiff explained that it combines with his pain, vertigo, and double vision. (*Id.*) Plaintiff asserted that he is easily distracted, takes "mood medication," and gets irritable about street noises and loud noises. (AR 54.) Plaintiff tries to minimize distractions and he does not rush anywhere. (*Id.*) If Plaintiff goes to a medical appointment, "that's [his] full task for the day." (*Id.*)

Plaintiff also testified that he has cranium nerve damage in his neck and left side of his face. (AR 53, 55.) Plaintiff asserted that the pain is constant, and it sometimes causes numbness in the bottom part of his hand, which makes it harder to grab objects. (AR 56.) Plaintiff had been receiving injection medications, but he stopped because he was having dental work done. (AR 53.) Plaintiff attends therapy once or twice per week, which is two hours away by bus. (AR 55.)

Plaintiff last attended school in spring of 2016. (AR 56.) He took one class twice per week, and each class was an hour long. (*Id.*) Plaintiff dropped the class after two or three weeks and did not finish it because "[i]t became too much." (AR 56-57.) Plaintiff explained that it was overwhelming to keep up with his errands, doctor appointments, dental appointments, surgery, and therapy. (AR 57.) When Plaintiff had been in class, he experienced anxiety due to sudden noises and too many people in one space. (*Id.*) He was sometimes distracted and looked out the window. (AR 57-58.)

Plaintiff stated that he could walk no more than ten minutes with his cane before his ability to balance worsened. (AR 58.) He also has to stop walking due to street noise, loud cars, honking, or too much happening at once. (*Id.*) Plaintiff asserted that he unexpectedly loses his balance on his left side and he cannot turn his head to the left quickly enough. (AR 59.) Plaintiff explained that a car recently honked at him because he was not walking fast enough in the crosswalk, and he froze and had to reassure himself. (*Id.*)

///

7

Plaintiff takes medications for nerve pain and anxiety. (*Id.*) He experiences side effects of lethargy, drowsiness, and sleepiness. (AR 62.) Acupuncture helps Plaintiff's symptoms "maybe for five minutes," and it takes an hour and a half each way to commute to the treatment. (AR 60.) The ALJ observed that the record reflects that acupuncture "has been very helpful." (*Id.*) Plaintiff agreed, explaining that "it's super quiet in there." (*Id.*) Plaintiff further explained that the experience is "soothing" and he enjoys it. (AR 61.) After the ALJ read treatment records detailing Plaintiff's positive response to his treatment regimen, Plaintiff testified that the treatment helps temporarily. (*See id.*) Plaintiff explained, "It helps me reconnect to, okay, peace and quiet, but it does not—it treats the symptom." (*Id.*)

Plaintiff takes a nap for three or four hours every day. (AR 62-63.) He takes medication to sleep at night. (AR 63.)

Plaintiff testified that he does yoga daily and tries to stretch at home for fifteen or twenty minutes. (AR 63.) Plaintiff lives with a roommate who cooks, washes dishes, and deep cleans the kitchen and bathrooms. (*See* AR 64.) Plaintiff does his own light laundry and cleans the two cat litterboxes. (*Id.*) He stated that besides when he goes to appointments, he leaves the house about twice per week to go to the market or to get water. (AR 65.) Plaintiff does not attend social events or see other people regularly. (*Id.*)

c. *Plaintiff's Adult Function Report*

The ALJ also considered Plaintiff's allegations contained in his Adult Function Report. (*See* AR 29, 31.)

Plaintiff completed his Adult Function Report in February 2013. (AR 308-16.) Plaintiff stated that his balance "gets thrown off" whenever he moves his head. (AR 308.) Plaintiff explained that, when he moves, his double vision makes it hard to focus on what he is doing and what is in front of him. (*Id.*) Plaintiff also asserted that his chronic pain on the left side of his head "gets worse with stress and anxiety." (*Id.*)

In describing his daily activities, Plaintiff stated that he gets up, eats, gets ready, goes to class, comes home, eats, does homework, relaxes, watches television, reads, eats dinner, and goes to bed. (AR 309.) His daily hobbies are reading, watching television, listening to the radio, art, and watching PBS. (AR 312.) Plaintiff helps provide food and water to a pet, and he clean up after it "at times." (AR 309.) Plaintiff's roommate also helps feed the pet and take care of its litterbox. (*Id.*) Plaintiff stated that he prepares his own meals two or three days per week, which takes him about thirty minutes to an hour. (AR 310.) He prepares "easy stuff," such as sandwiches, salads, beans, rice, chicken, fruit, and nuts. (*Id.*) Plaintiff goes outside "almost daily," and he sometimes drives to the grocery store. (AR 311.) Plaintiff shops for food, toiletries, books, and school supplies one or two days per week for about two hours. (*Id.*) He talks to family members in Texas, and sometimes friends visit him. (AR 312.) When Plaintiff goes to class, he "tr[ies] to participate well." (*Id.*)

Plaintiff asserted that sometimes his pain keeps him up or wakes him up from sleep. (AR 309.) Since his symptoms began, he is less social, less patient, more anxious, and he sleeps more. (AR 312-13; *see* AR 314.) Plaintiff explained that "stress triggers a lot of the symptoms of [his] condition." (AR 314.)

### 2. Applicable Legal Standards

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Treichler v. Comm'r of Soc. Sec. Admin*., 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1036) (internal quotation marks omitted). If so, and if the ALJ does not find evidence of malingering, the ALJ must provide specific, clear

and convincing reasons for rejecting a claimant's testimony regarding the severity of his symptoms. *Id.* The ALJ must identify what testimony was found not credible and explain what evidence undermines that testimony. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). "General findings are insufficient." *Lester*, 81 F.3d at 834.

### 3. Discussion

"After careful consideration of the evidence," the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the evidence." (AR 25.) The ALJ relied on the following reasons: (1) Plaintiff's course of treatment; (2) activities of daily living; (3) inconsistent statements; and (4) lack of objective medical evidence to support the alleged severity of symptoms. (*See* AR 25-31.) No malingering allegation was made, and therefore, the ALJ's reasons must be "clear and convincing."

#### a. *Reason No. 1: Plaintiff's Course of Treatment*

The ALJ noted that Plaintiff "received conservative treatment only." (AR 31.) An ALJ may discount a claimant's credibility based on routine and conservative treatment. *See Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment."); *see also Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (rejecting a plaintiff's complaint "that she experienced pain approaching the highest level imaginable" as "inconsistent with the 'minimal, conservative treatment' that she received"). In February 2014, Plaintiff reported that Botox injections had worked well. (AR 608; *see* AR 27.) In March 2014, Plaintiff reported that magnesium improved his headaches. (AR 603; *see* AR 27.) He was also helped symptomatically by Botox injections, capsaicin cream, and prism glasses. (AR 603, 605; *see* AR 27.) Plaintiff reported

improvement of his neck pain when taking Tramadol. (AR 641; *see* AR 27.) In July 2016, Plaintiff again reported that Botox injections had helped him over the years. (AR 985; *see* AR 28.) Because Plaintiff's treatment primarily consisted of medication, the ALJ permissibly discounted Plaintiff's credibility based on his conservative treatment plan. *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."); *see also Ryan*, 528 F.3d at 1198 (an ALJ's decision should be upheld "[w]here evidence is susceptible to more than one rational interpretation").

The ALJ also observed that the record reflected a history of Plaintiff's non-compliance with treatment. (AR 25, 31.) When assessing a claimant's credibility, an ALJ may consider an unexplained or inadequately explained failure to follow a prescribed course of treatment. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *Burch*, 400 F.3d at 68. Here, the ALJ observed that Plaintiff had been referred to vestibular rehab, but he had stopped attending sessions. (AR 26; *see* AR 421.) November 2013 treatment records indicate that Plaintiff's last routine primary care visit was in April 2013. (AR 456.) Those records also indicate that Plaintiff had not been seen for vestibular rehab since May 2013, and he failed to follow up with the neurology office in April 2013. (AR 457; *see* AR 26-27.) Plaintiff's neurologist noted in January 2014 that Plaintiff had last been seen in the neurology clinic in October 2012, where he was referred to vestibular rehab but was "lost to followup." (AR 441; *see* AR 26.) The ALJ therefore permissibly discounted Plaintiff's credibility due to his non-compliance with treatment. *See Orn*, 495 F.3d at 638 (if a claimant complains of disabling pain but fails to seek or follow prescribed treatment, "an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated" (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))).

///

The Court finds that this reason is a clear and convincing reason, supported by substantial evidence, to discount Plaintiff's credibility.

b.    _Reason No. 2: Activities of Daily Living_

The ALJ found that Plaintiff's daily activities "are not limited to the extent one would expect, given complaints of disabling symptoms and limitations." (AR 29, 31.)  The ALJ noted that Plaintiff went to school, cleaned, cooked, went to the library, swam, and went to Dead Philosophers Society meetings. (AR 29.)  The ALJ also noted that Plaintiff rode the bus two hours one way to attend physical therapy and 90 minutes one way to attend acupuncture treatment, did yoga daily, studied French, and walked to the market three times per week. (AR 31.)

Inconsistencies between symptom allegations and daily activities may act as a clear and convincing reason to discount a claimant's credibility. _See Tommasetti v. Astrue_, 533 F.3d 1035, 1039 (9th Cir. 2008); _Bunnell v. Sullivan_, 947 F.2d 341, 346 (9th Cir. 1991).  But a claimant need not be utterly incapacitated to obtain benefits. _Fair_, 885 F.2d at 603.  "If a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." _Morgan v. Comm'r of Soc. Sec. Admin._, 169 F.3d 595, 600 (9th Cir. 1999); _accord Vertigan v. Halter_, 260 F.3d 1044, 1050 (9th Cir. 2001).

The fact that Plaintiff performs some daily activities does not detract from his overall credibility, as the record does not show that this consumes a substantial part of Plaintiff's day.  The ALJ also failed to explain how Plaintiff's activities translate into an ability to perform regularly in the workplace. _See Orn_, 495 F.3d at 639 (stating that an ALJ erred in rejecting a claimant's testimony due to daily activities that were "so undemanding that they cannot be said to bear a meaningful relationship to the activities of the workplace").

///

12

Further, the mere ability to perform some tasks is not necessarily indicative of an ability to perform work activities because "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Fair*, 885 F.2d at 603; *see also Molina*, 674 F.3d at 1112-13 (the ALJ may discredit a claimant who "participat[es] in everyday activities indicating capacities that are transferable to a work setting"). The critical difference between such activities "and activities in a full-time job are that a person has more flexibility in scheduling the former . . . , can get help from other persons . . . , and is not held to a minimum standard of performance, as [he] would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (cited with approval in *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014)). Indeed, Plaintiff stated that he was unable to continue going to school because "[i]t became too much" and he was overwhelmed when keeping up with his medical appointments, surgery, and therapy. (AR 56-57.) At times, Plaintiff also lived with a roommate who cooked and cleaned the house. (*See* AR 64.)

In sum, the Court finds that this reason is not a clear and convincing reason, supported by substantial evidence, to discount Plaintiff's credibility.

c. *Reason No. 3: Inconsistent Statements*

The ALJ noted that although Plaintiff alleged that he stopped working due to his vertigo and anxiety, he had told a treating physician that he lost his job because he was not understood and was poorly treated by his coworkers due to racial issues. (AR 31; *see* AR 53-54, 462.) The ALJ acknowledged that the inconsistent information may not be the result of a conscious intention to mislead, but he found that the inconsistencies suggest that Plaintiff's information "generally may not be entirely reliable." (AR 31.)

An ALJ may consider inconsistent statements by a claimant in assessing his credibility. *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001). However,

"a single discrepancy fails to justify the wholesale dismissal of a claimant's testimony." *Popa v. Berryhill*, 872 F.3d 901, 906-07 (9th Cir. 2017) (citing *Robbins*, 466 F.3d at 883-84).

Because the ALJ fails to identify any other inconsistency, the Court finds that this reason is not a clear and convincing reason, supported by substantial evidence, to discount Plaintiff's credibility.

      d.    *Reason No. 4: Lack of Supporting Objective Medical Evidence*

The lack of supporting objective medical evidence cannot form the sole basis for discounting testimony, but it is a factor that the ALJ may consider in making a credibility determination. *Burch*, 400 F.3d at 681; *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)).

The ALJ summarized Plaintiff's medical records, noting his history of Ramsay Hunt Syndrome with complaints of headaches, dizziness, vertigo, hearing loss, left-sided neck pain, and left-sided facial weakness, spasms, and pain. (AR 25.) The ALJ also noted that Plaintiff "has a history of being non-compliant with medications" and that he "did not always make his best effort on examination." (AR 25; *see* AR 25-31.)

During a July 2012 consultative examination, Plaintiff generated 60 pounds of force with his right hand and 50 pounds of force with his left hand. (AR 357; *see* AR 29.) His cervical spine and lumbar spine were grossly normal, without tenderness to palpation or muscle spasm. (AR 356.) Plaintiff had normal muscle tone and bulk without atrophy, and his strength was 5/5 throughout. (AR 358; *see* AR 29.) No speech impairment or neurological defects were noted. (AR 359; *see* AR 29.)

In August 2012, Plaintiff reported chronic, intermittent vertigo and left-sided facial weakness. (AR 591; *see* AR 25.) Plaintiff also reported that his symptoms were slowly getting worse and his vertigo was becoming more frequent. (AR 591;

14

*see* AR 25.)  Plaintiff had no other complaints and was not on any medications. (AR 591; *see* AR 25-26.)  In September 2012, an MRI of Plaintiff's brain was "overall normal" and "overall unremarkable."  (AR 507; *see* AR 26.)

In October 2012, Plaintiff was still able to drive short distances, and he reported feeling very anxious about going outside of his house.  (AR 381; *see* AR 26.)  The treating physician observed giveaway weakness upon examination, noting that Plaintiff was not making his best effort.  (AR 381; *see* AR 26.)

After beginning medication, Plaintiff reported "significant improvement" of his vertigo and headaches in January 2013.  (AR 371; *see* AR 26.)

Following a referral from a behavioral medicine clinic, Plaintiff underwent a mental health initial assessment.[3]  (*See* AR 721.)  Plaintiff was late to his appointment and had difficulty completing the paperwork.  (*Id.*; *see* AR 27.)  He reported anxiety that interfered with his daily functioning, distraction, and social discomfort.  (AR 721-22; *see* AR 27-28.)  His one close relationship and strong source of social support was his roommate.  (AR 723-24; *see* AR 28.)  Upon examination, Plaintiff had increased latency of response with slow speech.  (AR 725; *see* AR 28.)  His thought process was tangential, circumstantial, and disorganized.  (AR 725-26; *see* AR 28.)  Although Plaintiff's insight was limited, the ALJ described the rest of the examination as good.  (AR 28, 726.)  The ALJ noted that the rest of the record shows fairly good mental status examinations and improvement with treatment.  (AR 27.)

In March 2013, Plaintiff reported constant vertigo that was exacerbated by sudden head movements, but improved by tilting his head to the right.  (AR 431; *see* AR 26.)  Plaintiff endorsed disequilibrium and near-fall experiences three or four times in the past year.  (AR 431; *see* AR 26.)  Plaintiff also reported left

---

[3] The ALJ states that these records refer to an examination on March 29, 2014. (AR 27-28.)  The Court observes a date of March 29, 2013 at the top of the records. (*See* AR 721.)  The apparent end of the examination record was signed on April 19 and 22, 2013.  (*See* AR 730.)

temporal numbness and tingling sensation with phonophobia and photophobia, neck pain, and lightheadedness. (AR 431; *see* AR 26.) Plaintiff could still drive short distances, but he again stated that he felt very anxious about going outside of his house. (AR 431; *see* AR 26.) On examination, Plaintiff's head tilted to the right, he had facial tics to the left, and his strength was 4/5 bilaterally. (AR 432-33; *see* AR 26.) He could go from sitting to standing without assistance, reach, touch the floor, and step up, but he could not perform a single-leg stand for ten seconds. (AR 432; *see* AR 26.) Clinical findings indicated a high fall risk, deconditioned status, poor stepping strategy, impaired somatosensory integration, and visual dependence for balance. (AR 433; *see* AR 26.) The examining physical therapist concluded that Plaintiff was unable to safely cross the street, alternate steps without rails, and maintain balance on compliant surfaces. (AR 434; *see* AR 26.) She also noted below average conditioning and a high fall risk. (AR 433; *see* AR 26.) She recommended vestibular rehabilitation for strengthening exercises and stepping strategy. (AR 433; *see* AR 26.) By April 2013, Plaintiff's balance was improving with vestibular rehabilitation, and he reported that he had not fallen since starting therapy. (AR 468; *see* AR 26.)

In June 2013, Plaintiff complained of blurring or double vision, and he stated that he felt like his head was bobbing. (AR 425; *see* AR 26.) He had intermittent pain occurring about three times per day, up to three hours at a time, which started as numbness before becoming sharp pain. (AR 425; *see* AR 26.) Plaintiff also had some phonophobia and light sensitivity. (AR 425; *see* AR 26.) He stated that he had been seen by neurology and was taking medication at night that helped "somewhat," but caused drowsiness. (AR 425; *see* AR 26.) A few months later, Plaintiff complained of worsening vertigo symptoms. (AR 421; *see* AR 26.)

In January 2014, Plaintiff reported no worsening of his diplopia, vertigo, hearing loss, hyperacusis, and facial spasms. (AR 441; *see* AR 27.) In March 2014, Plaintiff stated that his pain related to his Ramsay Hunt Syndrome was

controlled, although still at a 6 out of 10.  (AR 603; *see* AR 27.)  He endorsed significant anxiety with going to work because other nursing staff spoke in different languages and he was unable to "tune it out."  (AR 603; *see* AR 27.)  Plaintiff's treating neurologist found that Plaintiff was stable from a neurologic perspective, with the exception of pain.  (AR 605; *see* AR 27.)

In August 2014, Plaintiff reported that he tripped on uneven pavement when walking with a friend, which resulted in five days of lower back pain, pain radiating down his left leg, and difficulty bending and moving.  (AR 652; *see* AR 27.)  X-rays showed no acute fracture, no compression deformities, mild L5-S1 degenerative disc disease, and straightening of the normal lumbar lordosis.  (AR 750; *see* AR 27.)  Plaintiff reported that his back pain from the incident had "completely subsided" by November 2014.  (AR 641.)  His gait was stable.  (AR 642; *see* AR 27.)  Left-sided facial drooping was noted.  (AR 642; *see* AR 27.)

Imaging studies of Plaintiff's spine were performed in September 2015, which revealed mild degenerative disc disease at C5-6 and C6-7 with mild posterior disc bulges, mild facet arthropathy at C4-5, moderately severe bilateral arthroparthy at C5-6, and moderate bilateral C6-7 neural foraminal stenosis.  (AR 746; *see* AR 27.)  A nonspecific left thyroid lobe lesion was noted on T1 and T2.  (AR 746; *see* AR 27.)  The ALJ observed that these mild findings were consistent with the unremarkable clinical findings.  (AR 27.)  The ALJ referred to Plaintiff's steady gait unassisted, intact range of motion of the cervical spine, and upper strength of 5/5 in June 2014.  (AR 27; *see* AR 792-93.)  In June 2016, Plaintiff had a normal electrodiagnostic study, and he was recommended physical therapy and acupuncture.  (AR 897; *see* AR 27.)

During an October 2014 appointment with a psychiatrist, Plaintiff complained of feeling drowsy due to medications, and he planned to be physically active.  (AR 638; *see* AR 28.)  He made good eye contact, his mood was anxious, his affect was blunted, and his judgment was limited.  (AR 638; *see* AR 28.)

17

Plaintiff's thought process was "more organized" and his insight was good.  (AR 638.)  In January 2015, Plaintiff stated that he limited his activity during the day and prefers to stay home alone, going out only once each day.  (AR 627; *see* AR 28.)  He stated that he becomes more anxious when he is outside in crowded places.  (AR 627; *see* AR 28.)  Plaintiff reported that his pain had been getting worse, which he partially attributed to the cold weather.  (AR 627; *see* AR 28.)  His gait was off-balance, and he constantly touched the left side of his face.  (AR 629; *see* AR 28.)  Plaintiff made good eye contact, had normal speech and thought, and was alert.  (AR 629; *see* AR 28.)  Plaintiff described his mood as "anxious."  (AR 629; *see* AR 28.)  The psychiatrist recommended that Plaintiff take his medication later in the afternoon to address Plaintiff's complaints of lethargy.  (*See* AR 28, 630.)

In July 2016, Plaintiff reported overall improvement with treatment.  (AR 985; *see* AR 28.)  His gait was steady and unassisted, and he had intact sensation and strength in his limbs and symmetric normal reflexes bilaterally.  (AR 985; *see* AR 28.)  Plaintiff had limited flexion and pain on end-range extension and rotation of his neck.  (AR 985; *see* AR 28.)

As previously discussed, some physicians noted that Plaintiff stopped attending his vestibular rehabilitation sessions, and he was "lost to followup" for other treatment.  (*See* AR 421, 441, 457; *see also* AR 26-27.)  The ALJ also noted that the main purpose of Plaintiff's November 15, 2013 visit was "to have paperwork completed for his attorney who is suing the government for an increase in the patient's benefits."  (AR 26; *see* AR 456.)  Plaintiff's main request at a March 24, 2014 appointment was also to fill out disability forms.  (AR 603; *see* AR 27.)

Overall, the ALJ determined that "there are no clinical findings supporting the degree of limitation alleged in this case."  (AR 31.)  Although Plaintiff's treatment records may be interpreted in more than one way, the evidence can rationally support the ALJ's determination.  Accordingly, the Court must uphold

his interpretation of the evidence.  *See Ryan*, 528 F.3d at 1198; *Robbins*, 466 F.3d at 882.

In sum, the Court finds that this reason is a clear and convincing reason, supported by substantial evidence, to discount Plaintiff's credibility.

### 4.      Conclusion

Because the Court found that two of the ALJ's reasons for discounting Plaintiff's credibility are not clear and convincing, the Court must decide whether the ALJ's reliance on those reasons was harmless error.  *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008).  The relevant inquiry "is not whether the ALJ would have made a different decision absent any error," but whether the ALJ's decision is still "legally valid, despite such error."  *Id.*   The "remaining reasoning *and ultimate credibility determination* [must be] . . . supported by substantial evidence in the record."  *Id.* (emphasis in original) (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)).  Here, given the discussion above concerning Plaintiff's course of treatment and the objective medical evidence, the Court concludes that the ALJ's credibility finding is legally valid and supported by substantial evidence.  *See Parra*, 481 F.3d at 751 ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995))).

### B.      <u>The ALJ Did Not Err In Assessing Plaintiff's Severe Impairments</u>

Plaintiff argues that the ALJ erred in not finding that his depression, anxiety, and cervical spine impairment were severe impairments.  (*See* JS 4-5.) The Commissioner argues that Plaintiff failed to establish that these impairments resulted in more than a minimal effect on his ability to perform work-related activities.  (*See* JS 5-10.)

///

///

### 1. Applicable Law

Step two of the sequential evaluation process is a *de minimis* screening device used to dispose of groundless claims. *Smolen*, 80 F.3d at 1290 (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987)); *see Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017) ("Step two is merely a threshold determination meant to screen out weak claims."). An overly stringent application of the severity requirement violates the statute by denying benefits to claimants who do meet the statutory definition of disabled. *Corrao v. Shalala*, 20 F.3d 943, 949 (9th Cir. 1994), *as modified on reh'g* (Apr. 7, 1994).

At step two, the claimant has the burden of demonstrating a severe medically determinable physical or mental impairment that meets the duration requirement, or a combination of impairments that is severe and meets the duration requirement.[4] 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 416.920(a)(4)(ii); *Yuckert*, 482 U.S. at 146 n.5. The impairment or combination of impairments must "significantly limit[] [a claimant's] physical or mental ability to do basic work activities." *Yuckert*, 482 U.S. at 153 n.11 (quoting 20 C.F.R. § 404.1520(c)); *see also Smolen*, 80 F.3d at 1290. The ability to do basic work activities "mean[s] the abilities and aptitudes necessary to do most jobs," and includes:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;
>
> (3) Understanding, carrying out, and remembering simple instructions;
>
> (4) Use of judgment;
>
> (5) Responding appropriately to supervision, co-workers, and usual work situations; and
>
> (6) Dealing with changes in a routine work setting.

---

[4] In order to satisfy the duration requirement, an impairment generally "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509; 20 C.F.R. § 416.909; *see Yuckert*, 482 U.S. at 140.

20 C.F.R. § 416.921(b) (effective until Mar. 27, 2017).

An impairment or combination of impairments may be found not severe only if the medical evidence clearly establishes a slight abnormality that has no more than a minimal effect on a person's ability to do work. *Webb v. Barnhart*, 433 F.3d 683, 686-87 (9th Cir. 2005). When reviewing an ALJ's step two finding, the Court must determine whether the ALJ had substantial evidence to find that the claimant did not have a severe impairment or combination of impairments. *Id.* at 687.

When a claimant alleges there is a mental impairment that prevents him from working, the Social Security Administration supplements the five-step sequential evaluation process with additional inquiries. *See Maier v. Comm'r of Soc. Sec. Admin.*, 154 F.3d 913, 914-15 (9th Cir. 1998) (per curiam) (citing 20 C.F.R. § 416.920a). First, the ALJ must evaluate a claimant's symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment. If such an impairment is found, the information that substantiates the presence of the impairment must be documented in the ALJ's decision. 20 C.F.R. § 416.920a(b)(1), (e)(4).

Next, the ALJ must rate the degree of the claimant's functional limitation resulting from the impairment in four broad functional areas and record it. *See* 20 C.F.R. § 416.920a(b)(2), (c)(3), (e)(4). The four areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 416.920a(c)(3).[5] The first three functional areas are to be rated on a five-point scale of "none," "mild," "moderate," "marked," and "extreme." 20 C.F.R. § 416.920a(c)(4). The fourth area is to be rated on a four-point scale of "none," "one or two," "three," and "four or more." *Id.* After rating the degree of functional limitation resulting from a claimant's

---

[5] This section was amended as of January 17, 2017. Because the ALJ's decision is dated October 28, 2016, the Court refers to the prior version of 20 C.F.R. § 416.920a(c)(3), which the ALJ used in his analysis.

impairment, the ALJ must then determine the severity of the claimant's mental impairments. 20 C.F.R. § 416.920a(d). If the claimant's degree of limitation in the first three functional areas is "none" or "mild" and "none" in the fourth area, the ALJ may generally conclude that a claimant's impairment is not severe unless evidence indicates that the claimant has more than a minimal limitation in his ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1).

If a claimant's mental impairment is severe, the ALJ must determine whether it meets or is equivalent in severity to a listed mental disorder in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920a (d)(2). If a claimant's severe mental impairment neither meets nor is equivalent in severity to any listing, the ALJ is to assess the claimant's RFC. 20 C.F.R. § 416.920a(d)(3). The ALJ's decision must incorporate the pertinent findings and conclusions, must show the significant history and functional limitations that were considered when reaching his conclusion about the severity of a claimant's mental impairment, and must include a specific finding as to the degree of limitation in each of the described functional areas. 20 C.F.R. § 416.920a(e)(4).

### 2. Discussion

#### a. *Anxiety and Depression*

The ALJ found that Plaintiff's medically determinable mental impairments of depression and anxiety, "considered singly and in combination, do not cause more than minimal limitation" in Plaintiff's ability to perform basic work activities and, therefore, are not severe. (AR 22.)

First, the ALJ considered Plaintiff's activities of daily living and found that he has no limitation. (*Id.*) The ALJ noted that Plaintiff is able to live alone, and he spends time listening to music, reading, completing housework, and using the computer. (AR 22; *see* AR 309, 361-62.) Plaintiff could independently bathe, dress, make meals, complete household chores, and shop. (AR 22; *see* AR 362.) Plaintiff also reported walking two blocks to the market three times per week,

being independent with all activities of daily living, doing yoga daily, and riding the bus. (AR 22; *see* AR 913, 976.) The ALJ also considered Plaintiff's August 2016 testimony regarding his activities of daily living. (AR 22.) The ALJ noted that Plaintiff had stopped going to school because it conflicted with doctors' appointments. (*Id.*) Plaintiff had testified that he did light laundry, cleaned the litterbox for his two cats, went to the market, and rode the bus up to two hours to his appointments. (*Id.*)

Second, the ALJ found that Plaintiff has no limitation in social functioning. (AR 22.) The ALJ acknowledged Plaintiff's testimony that he does not go to social events and does not go to see people. (*Id.*) However, the ALJ also observed that during a consultative examination, Plaintiff was pleasant, cooperative, and socially responsive. (*Id.*; *see* AR 362.) Plaintiff gave adequate effort and his speech was clear. (AR 22; *see* AR 362.) The examining physician opined that Plaintiff had an intact ability to interact appropriately with supervisors, coworkers, and peers on a consistent basis. (AR 22; *see* AR 364.) The ALJ also noted that Plaintiff has been able to attend school, and he stopped because of conflicts with his doctors' appointments. (AR 22; *see* AR 83-84.) Plaintiff also reported going to the market three times per week. (AR 22; *see* AR 913.)

Next, the ALJ found that Plaintiff has no limitation with regard to concentration, persistence, or pace. (AR 22.) The ALJ observed that during Plaintiff's consultative examination, his thoughts were organized in a linear manner, there was no psychomotor slowing, his memory was intact, and his attention and concentration were intact. (AR 22-23; *see* AR 362.) The consultative examiner had opined that Plaintiff was able to understand, remember, and carry out short and detailed instructions. (AR 23; *see* AR 364.) The ALJ also found that Plaintiff's ability to study French and attend weekly Dead Philosophers Society meetings were inconsistent with allegations of impaired concentration, persistence, and pace. (AR 23.)

Finally, the ALJ found that Plaintiff's medical records did not show any episodes of decompensation of extended duration. (*Id.*)

Because the ALJ found that Plaintiff's medically determinable mental impairments caused no more than "mild" limitations with no episodes of decompensation, the ALJ concluded that Plaintiff's impairments are non-severe. (AR 23.)

Plaintiff contends that in December 2012, he reported feeling anxious about leaving his house. (JS 4; *see* AR 381.) In March 2013, Plaintiff alleged anxiety, inability to concentrate and express himself, discomfort with socializing, and excessive worrying. (JS 4; *see* AR 484.) Plaintiff also reported being uncomfortable in social situations and distracted by "small details" that prevented him from finishing tasks. (JS 5; *see* AR 478.) However, these notes reflect only Plaintiff's own reports of his discredited subjective allegations, sometimes directly quoting Plaintiff. (*See* AR 478; *see also* AR 629, 638.)

Plaintiff also points to observations of anxiety, depressed mood, "odd" affect, slow and labored speech, difficulty with word-finding, impaired memory, disorganized thought process, limited judgment, and poor insight. (JS 5; *see* AR 382, 460, 462, 477, 484, 638, 709.) But as the Commissioner notes (JS 8), despite these occasional references, Plaintiff did not have significant cognitive impairments upon examination. (*See, e.g.*, AR 460, 638, 709.) Additionally, some records offer reasons other than depression or anxiety to explain Plaintiff's alleged difficulties. (*See* AR 382 ("difficulty with word finding (English as a second language?)"); AR 460, 462, 638, 709 (Asperger syndrome).) Despite conflicting or ambiguous evidence here, it is the ALJ's duty to make findings and resolve conflicts in the evidence. *See Reddick*, 157 F.3d at 725. Because this evidence is "susceptible to more than one rational interpretation," the ALJ's decision must be upheld. *See Ryan*, 528 F.3d at 1198.

///

b. *Cervical Spine Impairment*

Plaintiff also contends that the ALJ failed to explain why Plaintiff's cervical spine impairment was not severe. (JS 5.) Plaintiff points to a September 2015 MRI that revealed moderate sized moderately severe bilateral C5-6, and moderate bilateral C6-7 neural foraminal stenosis. (*Id.*; *see* AR 746-47.) Plaintiff also refers to treatment notes that revealed "mildly diminished" vibratory sense on Plaintiff's right upper extremity. (JS 5; *see* AR 994, 1040, 1054.) On one visit, Plaintiff was directed to use capsaicin cream, Tramadol, and Naproxen as needed for his neck pain. (JS 5; AR 1079.) In October 2015, a neurologist opined that Plaintiff's upper extremity changes "are likely related to C5-6 and C6-7 neuroforaminal stenosis." (JS 5; AR 1041.) Plaintiff also pointed to his administrative hearing testimony about his chronic pain and August 2016 acupuncture treatment. (JS 5, 11.)

Notably, Plaintiff's application did not allege a cervical spine impairment. (*See* AR 96, 106, 260.) The ALJ nevertheless discussed Plaintiff's records of imaging studies of Plaintiff's spine, noting the generally mild findings. (*See* AR 27.) Although Plaintiff reported neck pain in July 2016, he denied shooting pain down the arms, nerve conduction studies were normal, sensation and strength in his limbs were intact, and there was limited flexion and pain on the end-range extension and rotation of the neck. (AR 28; 985-86.) Plaintiff also reported that his neck pain improved with medication. (AR 641.)

The claimant has the burden at step two to show that the alleged impairment significantly limits his ability to perform basic work activities. *See Yuckert*, 482 U.S. at 153 n.11 (quoting 20 C.F.R. § 404.1520(c)); *see also Smolen*, 80 F.3d at 1290. Because the evidence does not establish more than a minimal effect on Plaintiff's ability to do work, the ALJ did not err by finding that Plaintiff's cervical spine impairment was not a severe impairment. *See Webb*, 433 F.3d at 686-87.

///

///

## C.   The RFC Determination Is Supported By Substantial Evidence

The ALJ is responsible for assessing a claimant's RFC "based on all of the relevant medical and other evidence."  20 CFR §§ 404.1545(a)(3), 404.1546(c); *see Robbins*, 466 F.3d at 883 (citing Soc. Sec. Ruling 96-8p (July 2, 1996), 1996 WL 374184, at *5).  In doing so, the ALJ may consider any statements provided by medical sources, including statements that are not based on formal medical examinations.  *See* 20 CFR §§ 404.1513(a), 404.1545(a)(3).  An ALJ's determination of a claimant's RFC must be affirmed "if the ALJ applied the proper legal standard and his decision is supported by substantial evidence."  *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005); *accord Morgan*, 169 F.3d at 599.

In determining Plaintiff's RFC, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . [and] also considered opinion evidence" in accordance with social security regulations.  (AR 23-24.)

Plaintiff contends that the evidence supports more significant limitations related to his Ramsay Hunt Syndrome.  (JS 11.)  Specifically, Plaintiff contends that the ALJ did not consider his hearing loss, diminished cognitive functioning and concentration, weakness in all extremities, and difficulty with speech.  (JS 12.)  Plaintiff also contends that the ALJ failed to consider his inability to safely cross the street, use steps without support rails, and walk on uneven surfaces.  (*Id.*)

First, Plaintiff notes that in December 2011, Dr. David McDonough reported that Plaintiff's Ramsay Hunt Syndrome caused speech dysfunction, vertigo, trouble walking, and trouble with cognitive function, thinking, speech, and memory.  (JS 12; *see* AR 365.)  Plaintiff also notes that Dr. McDonough placed Plaintiff off work until October 2012.  (JS 12; *see* AR 365.)  The ALJ found that Dr. McDonough's opinion was not supported by detailed examination findings or by the substantial medical evidence of record.  (AR 30.)  This is a legally adequate reason for discounting Dr. McDonough's opinion.  *See Magallanes v. Bowen*, 881 F.2d 747,

751 (9th Cir. 1989) (an ALJ may disregard a treating physician's opinion that is brief, conclusory, and lacks clinical findings). Accordingly, the ALJ properly discounted Dr. McDonough's opinion, and the ALJ was not required to incorporate Dr. McDonough's proposed restrictions in the ultimate RFC determination.

Second, Plaintiff relies on Dr. Patrick Pieper's December 2012 consultation notes that identified left facial paresis, hearing loss, imbalance, and left facial pain as a result of Plaintiff's Ramsay Hunt Syndrome. (JS 12; *see* AR 380.) Plaintiff observed that Dr. Pieper indicated that Plaintiff was disabled due to those symptoms. (JS 12.) Although Dr. Pieper recorded Plaintiff's symptoms, no functional limitations were conveyed in his notes, and statements that a claimant is "disabled" or "unable to work" are not "medical opinions" under the Regulations. 20 C.F.R. §§ 404.1527(d), 416.927(d). Furthermore, as the Commissioner argues, in the record's context, it is not clear whether the notation of "disabled" was Dr. Pieper's conclusion or merely Plaintiff's report of his condition.

Third, Plaintiff contends that his physical therapist's notes indicated that he was unable to safely cross the street. (JS 12; *see* AR 434.) However, she had also recorded Plaintiff's explanation that he "gets extremely anxious in crossing the street for fear of falling," and thus it is unclear whether her notation was an assessed limitation or a recitation of Plaintiff's subjective allegations. The physical therapist also indicated that Plaintiff could not alternate steps without rails or maintain balance on compliant surfaces. (JS 12; *see* AR 434.) Additionally, she found below average conditioning and indicated that Plaintiff had a high fall risk. (JS 12; *see* AR 434.) The ALJ considered Plaintiff's alleged difficulties with ambulation, and he found that these allegations were not supported by the objective medical evidence. (*See* AR 30-31.) After considering the evidence, the ALJ ultimately "gave the claimant the benefit of the doubt" in limiting him to medium work with no work at unprotected heights or with dangerous machinery. (AR 29; *see* AR 30.) This is a rational interpretation of the restrictions required to

accommodate Plaintiff's stepping and balancing limitations. *See Reddick*, 157 F.3d at 725 (it is the ALJ's job to interpret and resolve conflicts in the evidence); *Ryan*, 528 F.3d at 1198 (an ALJ's decision should be upheld "[w]here evidence is susceptible to more than one rational interpretation").

Plaintiff also points to an October 2012 neurological examination (AR 382), audiology consultation notes (AR 379), complaints of vision issues and loss of concentration due to pain (AR 464-65), medications prescribed for pain (AR 451), and Botox injections for Plaintiff's left facial muscles (AR 447). (JS 12.) As discussed above, the ALJ thoroughly summarized Plaintiff's objective medical records and found that "no clinical findings support[ed] the degree of limitation alleged in this case." (AR 31.) The ALJ also considered the opinions of a consultative examiner, a state agency nonexamining physician, and Plaintiff's roommate. (AR 29-30.)

In sum, the Court finds that the ALJ's RFC assessment is supported by substantial evidence. *See Arrieta v. Astrue*, 301 F. App'x 713, 715 (9th Cir. 2008) (finding that substantial evidence supported the RFC determination when the ALJ properly evaluated the opinion evidence and relied on supporting medical reports and testimony).

## V. **CONCLUSION**

IT IS ORDERED that Judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: October 19, 2018

ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

### **NOTICE**

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS/NEXIS, OR ANY OTHER LEGAL DATABASE.**